We will now hear argument in the final argued case of the day which is Larry Severson versus Ross and the United States as intervenor. Thank you your honor. Good morning. May it please the court. Maya Waldron for petitioner Larry Severson. I intend to reserve about ten minutes. Okay. At Mr. Severson's trial for allegedly murdering his wife Mary, none of the experts could conclusively determine how Mary died. They all agreed she could have died of an accidental overdose. The state presented only circumstantial evidence and the defense presented a compelling case for acquittal. The prosecutor knew that he did not have a conviction in the bag so he resorted to relentless and blatant misconduct during rebuttal closing argument. He described Mr. Severson's affair as screwing some 21-year-old tramp. He vouched for the state's expert saying he was a very credible individual with nothing to lose. He told the jury innocent until proven guilty. Yes, today ends that preposition. There is no innocence in this courtroom except the innocence of Mary Severson. And the very last thing that the prosecutor told the jury was that Mary was a mother, a and it had meaning. Your duty today is to give her death justice. Now, defense counsel sat silently through all of that misconduct and under either ed pedeference or de novo review that was ineffective. So today I want to focus on me. Let me get at least from my perspective the concern before we get to prejudice. Uh you I'm sure you're very familiar with Strickland and the district court concluded the trial court concluded that um there was in quotes overwhelming evidence that the and therefore the first prong of Strickland was not satisfied. You've accurately described what was said in connection with the final uh claims by the prosecution to the jury. Obviously unless what was done fell below the standard for in this case capital defense lawyers in this case you lose on prong one. What is your best argument of the you cited all these things that were said. What's your best argument that what was said was so violative of the first prong of Strickland that basically we have to reverse because the failure to raise this issue if we get past the prejudice issue is just enough. You gotta have a new trial. What's your best argument to clarify your honor? You're asking about deficient performance specifically not prejudice, correct? Oh, I'm not getting the prejudice yet. I'm starting with the first prong which is whether the if you the conduct or lack of conduct by the council here fell below the standard of an appropriate capital defense lawyer so that the first prong of Strickland was not satisfied. The trial court said there was overwhelming evidence. There's no such problem. What's the best argument that the district court got it wrong? Yeah, well the magistrate court referred to overwhelming evidence. I don't see that as going towards deficient performance only to prejudice. All right, let's put that aside then. Let's go directly to the performance. Yeah, so my first point on deficient performance under 2254 D1 is that the Idaho Court of Appeals in Severson four, its decision was contrary to both Strickland and Roe versus Flores Ortega 2000 US Supreme Court case and that's because the Severson four never conducted the requisite analysis. It never determined whether or not defense counsel acted reasonably by failing to object. It just said this was probably strategic and it moved on. Now we know from Roe versus Flores Ortega that explicitly that the question is not whether a decision was strategic. It was whether it was reasonable. So right off the bat, this gets past 2254 D1 and needs to review deficient performance de novo. On the merits, trial counsel simply could not have reasonably opted to sit silent through this barrage of misconduct. Again, we have vouching that was clear and unequivocal misconduct. We have the trampling of the presumption of innocence that goes to one of the most fundamental rights that Mr. Severson had at his trial. We have what by all accounts is incredibly offensive, egregious statements referring to Mr. Severson's affair as screwing some 21-year-old tramp. It would be helpful to me if we can maybe take these buckets of statements individually. So if we could just start with the comments about the affair partner. I guess I wonder why reasonable counsel couldn't have thought that these comments make the prosecution look terrible. So I'm going to sit back and let him make it. I'm going to let him sink himself by looking like a hothead using this kind of language before the jury. Why could that not have been a strategic or a reasonable choice? Just yeah. Well, I think in this situation, I understand wanting to focus on the separate comments. But when you have a barrage of improper comments, I don't think it's fair to say, oh, they let one improper comment slide. Here we had comment after comment after comment, and each of those was misconduct. If none of them are improper, then add it up. They're still not, you know, it's still not a problem, right? If the failures to object are not improper individually, they wouldn't add up to right. But if we assume that it can sometimes be reasonable to let a single improper comment slide, I think that argument falls apart when you have a pattern of misconduct. So are you saying that the the only way you win is on a cumulative basis, taking all the points that you've made? If cumulative that adds up, then you win. If not, you lose? No, Your Honor, because I don't think that that deficient performance rests on cumulative error. My point is simply that letting a single comment slide might be reasonable. But when you have a pattern of misconduct throughout a rather short rebuttal argument, that that failing to object to those repeated instances of misconduct cannot. Are we getting into a circular argument? Judge Thomas just pointed out, okay, you've got this individual comment about screwing some 19-year-old tramp. She's saying, couldn't that have been a strategic decision? If I understand you, you're saying, well, if you go through the whole series of these together and you add them all together, that's the problem. That's why I said, do you depend on a cumulative number of these together? Or is there some individual comment by the prosecutor that sinks their case? Your Honor, they're each misconduct. It was unreasonable to object to each of them. It was particularly unreasonable to fail to object to the series of misconduct. I take it your argument is that if you take one comment in isolation out of a long argument, there may be arguably some strategic value there, but there's no strategic value when the misconduct happens the second time and then the third time. Any strategic value essentially is gone once the prosecutor keeps repeating the misconduct? Yes, Your Honor. Look, I think we have here what the jury could see as acquiescence, that defense counsel didn't say, wait a second, you can't use that type of language in the court. Beyond it just being unreasonable not to intervene, really it signals to the jury that defense counsel is somehow in agreement with or acquiescing in these statements. Each separate instance of was unreasonable. It was unreasonable for defense counsel not to object to them, but particularly as Judge Wynn said, when you add them all together, it simply is unreasonable to fail to object to such an egregious series of misconduct. That gets back then to what I raised in the first place, which is you're to be successful, you have to be successful on the cumulative impact of these individual objectionable comments by the prosecutor. Is that correct? Getting to prejudice, Your Honor, I would argue that under... Go back to the first part, because I think if I understood you correctly, you're saying that as to step one, the cumulative impact is what lets you win. Is that wrong? No, that is not what I'm saying. What I'm trying to say to be clear is that each statement was misconduct. It was deficient performance to fail to object to each statement individually. But particularly when you look at the big picture, no reasonable attorney could sit back and allow the prosecutor to engage in this repeated pattern of misconduct and rebuttal. I still don't think that you've answered my question, because I asked you a question about these two comments. You said it wasn't fair to just look at these two comments, but I think your answer to Judge Smith's question is that you're not arguing that we need all of them in a cumulative fashion, that it was a failure to object to each of them individually. So it'd be helpful to me if you could tell me why the failure to object to those two comments. Yeah, because this was outrageous. It was absolutely outrageous for the prosecutor to refer to this affair as Mr. Severson screwing some 21-year-old tramp. That language was clearly calculated to inflame the passions and prejudices of the jury. And although the jury might have thought, oh, that's not proper language to use in a courtroom, you didn't have an objection. You didn't have an instruction saying to disregard it. So that is absolutely unreasonable. Well, counsel, you're going to have to overcome prejudice as well. I mean, I tend to agree with you that these statements are beyond the pale as two state Supreme Court justices agreed with that. I think your problem on prong one is that now we have a layer of deference that we apply that the state justices don't have. But assuming that you get past that burden, the evidence seems pretty compelling. So can you address the question of prejudice that shows that she was poisoned? Absolutely. Yes, Your Honor. Yeah. So just as an initial matter again on prejudice, the court's decision was also contrary to Strickland. So also on that prong, the court should review it de novo. And that's because it didn't think there was such a thing as cumulative prejudice on post-conviction. It declined to consider and accumulate the about the affair because Severson one had found that they were individually not prejudicial. So it didn't it didn't ever conduct a cumulative error analysis. We know from Strickland itself that all errors must be considered together when deciding prejudice. And that includes errors that are individually not prejudicial, such as the comments about the affair. But I'm not sure I'm you there, but but let's tackle the evidence because, yeah, the lies told there was a pulling of the insurance policy immediately after her death. There was evidence that was found at the house. You're going to have to overcome that. Absolutely, Your Honor. So under prejudice, even under 2254 D1 and having to show that it was an unreasonable application, every fair minded jurist would conclude that there was a reasonable probability that had counsel objected, the jury would not have found guilt. So as I already discussed that on what? I'm sorry, what's that? You base your statement on what? That every fair minded jurist would have not convicted? Yeah. What are you basing that on? Well, let me yeah, let me explain. So as I just discussed, the misconduct was repeated, egregious and impactful. It was the very last thing that the jury heard from the attorneys. The standard instructions did not address the misconduct, couldn't have cured the violations. And getting getting to, I think, the heart of Judge Wynn's questions, the case was purely circumstantial. And I strongly disagree that there was overwhelming evidence. This was not a slam dunk. Again, none of the experts could conclusively say how she died, whether it was accidental or a that she could have accidentally overdosed. So that circumstantial evidence was used to prove not just that Mr. Severson murdered Mary, but that this was a homicide at all, as opposed to an accidental death. The smothering theory was speculative, and it was refuted by the defense expert. And then there was a bunch of evidence to support acquittal. So Mr. Severson in the months leading up to Mary's death was trying to figure out what was going on with these hydroxycut pills. And he essentially talked to anybody who would listen to try to figure that out. He talked to his own pharmacist, the Idaho Board of Pharmacy, the USDA, the manufacturer. A friend of his testified that Mr. Severson... But the jury had all of that and they rejected it. They did, Your Honor, but they rejected it after two days of deliberations. So when you have a two count charge, and it was a long trial, but it wasn't a complicated case, a super technical case or anything like that, when the jury deliberates for two days, that should signal to this court, more than anything else, that this was not a straightforward case, that the jury did not see it as clear cut. And then when you pair that with the egregiousness of the misconduct, the fact that it was one of the very last things that the jury heard, we absolutely show prejudice under either DeNova review or Edpa deference. Well, even on DeNova review, the prosecution now gets the benefit of all the inferences in their favor. It's really hard when you have a strong defense and the jury heard it and they rejected it. Well, but then I think, Your Honor, you would never overcome the burden because we're always here on a conviction, right? Again, I think the big picture, if you zoom out, is comparing the relative strength or weakness of the state's case to the egregiousness. It's not like the government didn't have any evidence. You've got motive, you've got numerous unexplained, inescapable lies told to multiple people. You've got physical evidence found in the house that corroborated the prosecution's case. That's a strong case. You know, some of that evidence did corroborate the state's case. A lot of it also could cut both ways. And so I think that's important to recognize. It wasn't totally indicative of guilt rather than innocence. But I would direct the court to this court's decision in Zapata because it's a very similar scenario where you have misconduct in closing, in rebuttals specifically. And there, this court found that the prejudice determination was unreasonable under EDPA deference. And there was plenty of evidence in that case that Zapata was guilty of this murder, including witness testimony that he had confessed to shooting somebody up outside of a 7-Eleven. So the strength of the case here, I don't think, is any stronger than in Zapata. And there, this court found that the egregious misconduct overcame prejudice even under EDPA deference. Can you tell us of the evidence that Judge Wynn just recited? What are the pieces that you think cut both ways? If you could tell us what the strongest pieces are that cut both ways. Well, for example, I believe that the state cited to the sleeping pills being found in all of these various locations. And one of them was tucked in the brim of a hat that said dad or world's best dad or something like that. And so they said, oh, look, Mr. Severson had these pills. But my point is, if he's trying to murder his wife, he's not going to leave evidence tied directly to him other than to her laying around the house. So that's an example of a piece of evidence that could very easily cut both ways. How do you deal with the insurance policy issue? If I understand the record correctly, there was a, if you will, a claim that the mother or law had an insurance policy by a desk or by a bed, asked someone to get it. The mother-in-law or whoever it was denied that. He had previously also said that he didn't want a divorce because she had everything in her name. How do you distinguish that? I mean, is there any way to explain that in a way that benefits your client? I don't know that the insurance policy is here or there. The testimony, I believe, was that Mr. Severson thought the policy would give the money to him, but really it went to the mother-in-law, Mary's mother. But he asked to get the policy because he understood it differently, right? I believe there was testimony to that effect. And look, this is right. It's motive evidence, which is powerful when you have a evidence. That's not disputed. What I think this court needs to look at for prejudice is the relative strength of the state's case compared to the egregiousness. And again, that none of the experts knew how Mary died. They all said this could have been an accidental overdose. And it was just this circumstantial evidence that was used to not just convict Mr. Severson of murder, but to try to prove that this was a homicide in the first place rather than an accidental death. But circumstantial evidence plays into a lot of murder convictions, does it not? I think that it does. But, well, the court has more experience with this than I do. But I have not personally had a case where circumstantial evidence was used to prove that it was a homicide in the first place, where everybody agreed this could have been an accidental overdose. So I see that as quite different than your average murder case that uses, for example, circumstantial evidence to prove who shot the person or something along those lines. What about the evidence, if I understand correctly, that there was tape put on Mary's mouth that showed, if you will, a suffocation rather than just an accident? I don't remember testimony about tape, Your Honor. Or if you will, pressing down in a way that suggested suffocation. Yeah, there was some bruising and abrasion around her mouth. One of the state's experts thought that could be consistent with suffocation or smothering. The defense expert said no, that was due to resuscitation. So we had a layperson trying to and do CPR. And then finally at the ER as well, I believe the doctor attempted to resuscitate Mary. So again, nobody said 100% this was a smothering or this was a suffocation. It was she has some marks and some bruising, and it could have been that. And the defense refuted that, the defense expert. One of my colleagues already mentioned the insurance, but one of the other pieces of told a friend that Mary was dying of stomach cancer, but that her doctor didn't want her to know. I mean, I assume that, does that one cut both ways in your view? Yeah, well, I think that's tough because we do know that Mary had an ulcer. She had been diagnosed with an ulcer and was having some pretty serious stomach issues or intestinal issues. Exactly why he thought that was cancer, I don't know. The record doesn't show that, but you're right, Judge Thomas, that there was testimony that he had told acquaintances that he thought Mary was dying of cancer. And that her doctor didn't want her to know that, right? I believe that's right. Yes, I believe that's right. Yeah. I see I'm well into my rebuttals. You can certainly save the balance of your time if you'd like. I will. Thank you, Your Honor. Very well. Okay. Mr. Lieberman, please. I'm sorry. It's Mr. Gans. I apologize. Thank you, Your Honor. It may have pleased the court. Cale Gans on behalf of the Idaho Attorney General representing the warden in this matter. This case presents claims of ineffective assistance of counsel that come before this court on a doubly deferential standard of review. That first layer is through Strickland and the second layer is through the AEDPA. And to prevail, Mr. Severson needs to show that every fair-minded jurist would agree that every reasonable lawyer in defense counsel's shoes should have objected to the challenge statements in closing argument and that those failures were prejudicial in light of the overwhelming evidence of his guilt. And he has failed to show that. I do want to address the statements one by one, and I'm happy to take deficient performance and prejudice. I think of all the statements. I mean, screwing a 21-year-old tram, I'm not sure why a prosecutor would ever use that sort of inflammatory language. But as Judge Thomas points out, we tackle each individually, particularly with deference. And I think there's an argument that there may be some strategic reason to let the prosecutor go on and make themselves look bad. I don't think that argument really applies to the presumption of innocence argument to say, essentially, that today ends the presumption of innocence and there's no innocence in the courtroom except the innocence of Mary Severson or a statement along those lines. We've said in the case just a few years ago, Ford v. Peary, that in stating the presumption of innocence was over, the prosecutor misstated clear and longstanding federal law as articulated in the number of Supreme Court decisions. So when I look at this statement in the commentary on the presumption of innocence, it's very similar to the one that we found unacceptable in Ford v. Peary, which is a Ninth Circuit case from 2021. So how do you respond to that? Your Honor, I think that question is resolved by this court's decision in Molina, which didn't just look at whether or not the statement itself was improper or was misconduct, but whether or not defense counsel could have reasonably declined to object. And I think the answer is that defense counsel has very wide latitude in making that decision in closing argument. Really, this is one of the quintessential tactical decisions that defense counsel can make. And this court said in Molina that it doesn't follow from the failure to object to the objectionable statement that that automatically or necessarily means that counsel was deficient. How could that statement possibly be strategic, saying that there was no one innocent except for the victim in the courtroom? I just don't see what reason defense counsel could have to not object to that. Well, so it's not the state's burden at this point to produce a reason and basically prove that defense counsel's move was not unreasonable. So under Strickland, we presume that the choice not to object to an objectionable statement in closing argument especially, we presume it falls within the wide boundary of reasonable professional assistance. And Molina, this court gave a long list of reasons why defense counsel might say, I could object to that and maybe that objection would even be sustained. But maybe I don't want to be seen as hyper technical. Maybe I don't want to be seen as desperate. Maybe defense counsel agreed with my friend on appeal. Maybe they thought that they had presented such a strong case based on their evidence, which of course the state disagrees with. But maybe taking all of that in defense counsel could have concluded to himself that this is not the time that I'm going to leap out of my chair and make an objection. And I think it bears noting too that the one objection that defense counsel did make was immediately overruled by the court and it essentially opened up a line of attack for the prosecutor to focus on and highlight the life insurance issue. So all of those reasons would factor into why defense counsel might decline to object, even if we can all agree that this statement was objectionable in and of itself. Given what Judge Wynn pointed out, if we can say that at least according to our circuit's law, the concept of the presumption of innocence being flipped was beyond the pale, that leaves the government with a prejudiced response. Is that correct? In other words, they may have succeeded in part one of Strickland, but they can't overcome prejudice. Is that the government's position? We're not conceding that they have succeeded on Prong Wynn, but you're right. If you take Judge Wynn's point. Correct. Because Forty Perry was also an ECA case. It was also a habeas matter. Although if I recall correctly, that was an ineffective system of counsel, but it also came to us on a habeas posture. Sure, and that point is well taken, but Judge Smith, I think you're right that that determination of deficient performance, that doesn't carry the day for Mr. Severson. We still need to go to prejudice and I'm happy to go there now if this court wants to discuss the evidence in this case or I'm happy to talk about deficient performance with the rest of the statements. Let me ask my colleagues. I know Judge Thomas was concerned about those individual points. Judge Thomas, do you want to have him go through the individual points or do you want to go to prejudice? I'd be fine to move to prejudice. Okay, sure. I'm happy to go there. I guess I might just append one slight rider to Judge Thomas. You said that, well, counsel might decline to object because the comments make the prosecution look terrible. And that's true. That is a very good reason for defense counsel to just sit there and let the prosecution make himself look bad. But the other reason not to object is because the prosecutor's comments made the prosecutor's own witness look bad, right? If he's talking about Severson screwing a 21-year-old tramp, well, the 21-year-old tramp in question is the state's own witness. So if defense counsel is hearing the prosecutor really rudely and just crassly and obnoxiously attacking his own witnesses at that point, that is another reason strategically to not object. So turning to prejudice, this was a case of overwhelming evidence. And I could go through the evidence point by point. We could talk about the life insurance. We could talk about the evidence that Severson had a clear motive to carry this out. We could talk about really everything this court has already highlighted. I do want to respond to a couple of points my friend has made, though. There is the one point on Mr. Severson putting the pills under his hat that said dad on it. And this sort of is of a piece with the argument that, well, why would Mr. Severson sort of join this armchair investigation into the hydroxycut adulteration? And I think my friend said it would be incredibly stupid for him to do such a thing and call attention to the hydroxycut. So I have two responses to that. I think the first is just to just level set the state's theory of the case. The state's theory of the case is not that Mr. Severson was a criminal mastermind and that every single move he made was entirely rational or highly intelligent. The state's theory of the case is that he had a plan. He wanted to get out of the marriage. He wanted to get rid of Mary. And he was making moves on the game board to try to make that happen. Now, some of those moves were blunders, right? But that's totally compatible with the state's theory of the case because we're not asserting that he was a grandmaster playing 40 chess as he did these things. But specifically, I want to respond to the point that it would have been incredibly stupid for Mr. Severson to call attention to the hydroxycut. It actually was not incredibly stupid. And Mr. Severson actually had a very good reason for calling attention to the hydroxycut. And this was all part of Severson's attempt to demonstrate to the world that he was not responsible for the poisoning. And why did he do that? Well, because he had to at that point. Because at the time Severson started to participate in this investigation, Mary had already told multiple third parties that something was wrong with the pills. And so if you go back to the timeline here on January 2nd, that's when Mary bought hydroxycut. And within a week, she was worn out. She was vomiting. Ultimately, she had stomach pain and was vomiting blood. And she told that to her doctor. And she told that to her mother. And specifically, she told her mother that the pills were causing her stomach problems and that the So the reason why Severson is participating in the quote investigation at that point is not because he's incredibly stupid, but because by that point, the cat is already out of the bag. Multiple third parties already know the pills are tainted and making Mary sick. So despite the fact that the initial attempt to poison her didn't work, Severson still needed to be reacting to this news in a concerned way in order to avoid being a prime suspect in her ultimate death. Now, another point I need to mention here is my friend is saying that, well, it was Severson who called the FDA. But no, the trial transcript reflects that it was Mike Severson's son who contacted the FDA. This is on 7 ER 1713 of the record. The person who took the complaint said it was Mike who called. And the clearest statement on record that you will find is on page 8 ER 1926. And that's Mike's testimony. And the discussion is about the decision to contact the FDA. And I'm just going to read from the transcript here. Question. Was that your idea or somebody else's answer? Well, yeah, it was my idea to call them to figure out what the problem was with them. Okay. So your father didn't say we need to investigate this or anything, right? At that point, he didn't. After I called them and couldn't get anywhere, he was like, well, what do you think I ought to do? Who should we call, you know, so we can find out what the deal is with these. And that's when I started calling the FDA question. So you made the initial call to the FDA answer. Yes. So, uh, we can't credit, uh, Mr. Severson with calling the FDA and setting this part of the investigation in motion. That was Mike that did that. Um, and that's one correction to just take on board as we're looking at, um, the evidence here. One last point on prejudice. I think it's important to note. Um, my friend is saying that, uh, Mr. Severson act in the way that a grieving and a shocked, um, husband would have, uh, in the aftermath of Mary's death. Well, we don't think the evidence supports the notion that he was grieving, but as to whether or not he was shocked, um, you know, I went back and I thought, let's look at the transcript. And is there anyone who describes Mr. Severson as shocked and you can do this yourself? You know, you can left the trial transcripts and you can read through them. And there is only one person in the entire 17 day trial who refers to Mr. Severson as being quote shocked. And the only person who says he looked shocked was Mary's mother, Carol Diaz, but she wasn't describing how Severson appeared in the aftermath of Mary's death. She was describing how Severson reacted to finding out that he was not the beneficiary under the life insurance policy. And this is from seven 1591. Um, Ms. Diaz says, and I asked him then if there was any life insurance, what did he say? And he kind of stammered around and said, no. And the question is, did you respond to that? What did you say? Answer? Yes, I did. I said, well, there is a life insurance policy and I'm the beneficiary question. Okay. How did he take this news? Answer shocked. And then the further question is, how did you know he was shocked answer? He just looked like he lost his best friend. I don't know how else to describe it. And then on cross defense counsel attempted to clean the sequence up. And I think he asked a fair question. And the question was, well, did he appear to be upset that you were discussing life insurance? So soon after your daughter's death answer, he just seemed to be upset when I told him I was the beneficiary. So that is the only time you will hear someone happened with the life insurance policy is back in October of 2001. Mary changed her life insurance policy and designated her mother as the sole beneficiary. Severson was unaware of that. And so he was hearing it for the first time that he was not the beneficiary under the life insurance policy. And a further point to make on the life insurance discussion is just that Mr. Severson lied about that, too, because one of the immediate things he asked for was a copy of the policy. And he lied to his son and said, well, Carol Diaz asked me to find it. But Carol Diaz testified quite plainly that she did not ask him to find it. So that was just another lie to add to the state's pile of evidence. I see I'm somewhat running low on time here, and I do want to address statute of limitations as it is the state's cross appeal. But I welcome this court's questions on either deficient performance or prejudice. From my perspective, you don't need to address the statute of limitations, but I don't want my colleagues. Any thoughts on that one? I don't have a question on statute of limitations. As I recall, counsel, he wasn't the one that called 911 to respond to the scene. Is that right? You're correct. You're correct. And in fact, he never called 911. The person who called 911 was Nora, his daughter-in-law. He called Nora to let them know that Mary was non-responsive. And at one point, Nora attempts to call him as they're driving to the residence, and they can't get ahold of him. They get a busy signal. And Nora testified that she thought that Mr. Severson was calling 911. She expected that that's who he was on the phone with. But the trial testimony and evidence showed that, in fact, he never called 911. Thank you, counsel. Very well. So you want to wind up in any way, or what's your pleasure? Sure, I'm happy to wind up. I would just ask this court to affirm the magistrate's denial of habeas relief. I would ask this court, if you don't affirm on those grounds, you would affirm the state's cross-appeal on statute of limitations. Thank you. Very well. Just a quick question. Under basically our advanced day sheet, we show a Mr. Lieberman from the government. Is there a Mr. Lieberman involved, or is he not involved today? Yes, I am here, Your Honor. Can you see me? All right. And how much time do you think you have? So I believe I was allotted 10 minutes. Very well. All right. Why don't you go ahead then, please? Yes, Your Honor. Good morning. May it please the court, Dave Lieberman, the Court of the United States, as intervener. I thank the court for allowing us to intervene to defend the constitutionality of AEDPA, which Petitioner has attacked. Before I launch into my affirmative presentation, I just want to spend a minute to flag the status of this Loper-Bright claim in the circuit, because it's before multiple panels. I was in Phoenix two weeks ago before the panel in McLean. That panel heard argument on this question, same claim. That panel has now deferred submission of that case to await a decision for another panel, Brown v. Broomfield, Ninth Circuit case number 23-99005. That case was submitted back in June of this year. It appears that the Loper-Bright claim was also raised in that case. It has been submitted. The United States did not receive any notice from the petitioner of the constitutional question in that case, so we did not have an opportunity to intervene. But my only point is, this is percolating before two other panels have heard oral argument on this question. We defer to the court as to which panel has priority, but at least the United States has welcomed some published circuit guidance on this question, given how many habeas cases are pending before district courts and panels of this court at any one time. We are continuing to receive notices of these constitutional claims and trying to respond, both in district court and before panels of this court, as best we can. Let me just, if I may, provide the government with some background. I'm on the first panel that has priority, and we should have a decision coming out fairly soon, but our panel understands that we're down the road in terms of that decision. I, at least as one judge, would appreciate the government's perspective. Can this case be decided without our being involved with the Loper-Bright issue? It was not raised on a timely basis in this case. So what's the government's position? Can we just do a gentle pas-de-deux and step to the side, not have to decide that, and still decide this case? Or do we have to wait for an outcome on the Loper-Bright question? Yes, your honor. I just want to say at the outset that the United States is not taking a position on the merits of petitioner's claim or the state's cross appeal. I think if this panel does not want to engage the Loper-Bright question, it could just assume that a deference does not apply and then reject petitioner's claim. But if this... But you're not tackling the forfeiture issue? I'm sorry, your honor? You're not tackling or weighing in on the potential forfeiture analysis in this case? Correct. We are only here to defend the constitutionality of AEDPA, the United States, as it has done in every multiple other cases. We are not addressing the merits of either party's arguments on the merits or any procedural issues in the case. And so I'm going to pause here and take a cue from the panel. If the panel does not want to entertain my arguments on the merits of AEDPA's constitutionality, given that the panel appears to be farther down in line, I'm happy to just pause and rest on our briefs if the panel believes that another panel is likely to rule on this. So the government's position is strictly the Loper-Bright question. If we're not going to get to that, you really don't have anything to tell us, right? That's correct, or just rest on my briefs. And if the panel does not wish to entertain this, I'm happy to take that cue and just return my time. I leave it to my colleagues. But as I say, I'm on that first panel. We know we have a decision coming out fairly soon that will decide, at least for our circuit, unless there's an en banc, the answer to that question. But I guess my question is, does the government believe that we can sidestep this issue and go on to the merits, assuming that AEDPA doesn't apply here, or does apply? What's your position? Your Honor, the panel is free to sidestep the question by just assuming that AEDPA deference does not apply. If it then holds that petitioner is not entitled to relief under, whether that's the Strickland framework, whether it's the other due process claims, I don't think it can grant relief without addressing the AEDPA question. I'll pause and ask if, at least if the two other members of the panel. I don't have any questions for the government. Yes, me neither. I don't have any questions either. Thank you. We turn the time, and I thank the panel for allowing us to hear. Ms. Waldron, you had some time left over. Mr. Ganz had a little time left over. Do you have anything more that you would like to tell the court, or have you done a thorough job and we don't need to talk anymore? I have a couple of points I would make, Your Honor, just in response to the state's argument. So the state took issue with, I think, my take on the hydroxycut pills, and Mr. Severson's demeanor. So first, in terms of his demeanor, my word was shocked. I wasn't purporting to quote the testimony, nor did I use quotation marks, but just looking at the testimony, Nora, the daughter-in-law, described him as hysterical and barely functioning. An officer, Officer Sterling, said Mr. Severson was very upset, and then there was also testimony that he was distraught at the hospital, and cried, and tried to hug Mary's body. So just to clarify, when I use the word shocked, that's my word. I'm not referring to, I'm not quoting any particular testimony. In terms of the hydroxycut investigation, let's see, on February 7th, Mr. Severson asked Mary's doctor to look at the pills, then he tried contacting the manufacturer, then he submitted a complaint to the Idaho Board of Pharmacy. They referred Mr. Severson to the FDA, and Mr. Ganz is right, it was originally Mike that called, but Mr. Severson met with the USDA investigator, appeared very concerned, according to that investigator. He cooperated fully, answered all questions, and had a free-flowing conversation. So I don't want to quibble too much with those facts, but for what it's worth, I wanted to clarify some of those things. Very well. I'm sorry, go ahead. Just one more quick point, going to the prejudice. I would suggest to the court that given that this prosecutor, in his initial closing argument, kept it clean, didn't commit any misconduct, and then brought out this slew of misconduct on rebuttal, I would suggest to the court that the prosecutor did not see this case as clear-cut. He did not think he had a win in the bag. This was really an act of desperation, because the prosecutor thought that this conviction, after 17 days of trial, was slipping through his fingers. And again, I would point the court to the two days of deliberations. The jury did not see this as a straightforward win for the government. The jury struggled to reach a verdict. So when you compare the outrageous, egregious misconduct that was the very last thing that the jury heard, Mr. Severson has absolutely proven prejudice in this case and is entitled to a writ. That's all I have. Thank you. Thank you. Mr. Gantz, do you have anything else you'd like to say? Nothing else, Your Honor. Just ask the court to affirm. Very well. Thanks to all counsel in this interesting case. The case of Severson v. Ross and the United States' intervenor is submitted, and the court stands adjourned for the day. Thank you. The court stands adjourned. Thank you very much. Thank you.
judges: SMITH, NGUYEN, THOMAS